1
2
3
4
5
6
7
8
9
10
11                          **UNITED STATES DISTRICT COURT**

12                             **DISTRICT OF NEVADA**

13

14   THE CLOUD FOUNDATION, CRAIG      )        3:11-cv-00459-HDM-VPC
     DOWNER, and LORNA MOFFAT,        )
15                                    )
                     Plaintiff,       )        ORDER
16                                    )
     vs.                              )
17                                    )
     UNITED STATES BUREAU OF LAND     )
18   MANAGEMENT, KEN SALAZAR, ROBERT  )
     ABBEY, GARY MEDLYN, and BRYAN    )
19   FUELL,                           )
                                      )
20                   Defendants.      )
     _____)
21
22        Before the court is the plaintiffs' motion for a preliminary

23   injunction (#10).  Defendants have responded (#22), and plaintiffs

     have replied (#28).
24
          Plaintiffs, a nonprofit organization dedicated to protecting
25
     wild horses and two concerned persons,[1] seek to enjoin a Bureau of
26

27   _____

28        [1] At oral argument, defendants properly conceded that plaintiffs have
     standing to bring this action.

                                      1

Land Management ("BLM") round-up of wild horses in the Triple B,
Antelope Valley, and Maverick-Medicine Herd Management Areas
("HMAs"), and the Cherry Springs Wild Horse Territory (collectively
the "Triple B Complex" or "HMAs") set to begin on July 16, 2011.

**Factual and Procedural Background**

Covering just over 1.68 million acres in eastern Nevada, the
Triple B Complex is home to a number of different wildlife species,
including sensitive migratory birds, greater sage-grouse, antelope,
mule deer, and wild free-roaming horses. (Environmental Assessment
("EA") 3-4, 36-38). While livestock grazing is also allowed within
the Complex, over the last decade actual grazing has been less than
allotted in part due to drought and in part due to competition with
wild horses for forage. (*Id.* at 39, 41).

In order to manage the wild horses on its lands, the BLM
establishes appropriate management levels ("AMLs"), defined by BLM
as "the number of wild horses that can be sustained within a
designated HMA which achieves and maintains a thriving natural
ecological balance in keeping with the multiple-use management
concept for the area." (*Id.* at 4). In 2008, BLM prepared a
resource management plan ("RMP") which reaffirmed an AML of 250-518
wild horses for the Triple B HMA. (*Id.* at 4-5). AMLS of 166-276
wild horses for the Maverick-Medicine HMA and 16-27 horses for the
Antelope Valley HMA, initially established in a 1993 RMP, were last
adjusted to their current levels through final multiple use
decisions in 2001. (*Id.* at 5). The AML of 40-68 wild horses for
the Cherry Springs Wild Horse Territory was established in a 1993
management plan. (*Id.*) The current AMLs for the Triple B Complex
thus total between 472 and 889 horses. (*Id.*) The record does not

reflect that the plaintiffs objected to the AMLs when they were
established or reaffirmed through RMPs and other decisions in 1993,
2001, and 2008.

In 2006, the BLM removed what it had determined to be excess
horses in the Triple B Complex, leaving 610 horses in the Complex.
(*Id.*)  An aerial direct count inventory of the Complex in November
2010 observed 1,832 horses.  (*Id.*)  Based on this direct count and
the historic growth rate of the horses, BLM estimates that as of
this summer, the Triple B Complex likely contains about 2,198 wild
horses.  (*Id.*)  This number exceeds the low-range AML by 1,726
horses.  Accordingly, BLM has determined that it has the obligation
under the Wild Free-Roaming Horses and Burros Act to remove the
excess horses from the range.  16 U.S.C. § 1333(b)(2).

On January 7, 2011, BLM issued a Preliminary Environmental
Assessment proposing the gather.  The proposal included rounding up
all 2,198 horses and re-releasing 472 into the HMAs.[2]  BLM would
select horses for release with the goal of skewing the sex ratio to
60% male, 40% female.  In addition, the mares would be treated with
an immunocontraceptive drug designed to prevent pregnancy for two
years.  Unless adopted or sold, the horses that were not released
would be taken to long-term holding facilities in the mid-western
or eastern part of the country where they would remain.

The Preliminary Environmental Assessment was published for
public review and comment.  After considering the comments
received, BLM issued its Decision Record, Finding Of No Significant
Impact and Final Environmental Assessment ("EA") on May 17, 2011.

---

[2] The EA recognizes that round-ups have historically achieved gather
efficiencies of about 80%.  (EA 26).

The EA anticipated that the round-up would begin in early July or after October 1, 2011.[3]  (EA 10 n.2).  Pursuant to stipulation, BLM has agreed to wait until July 16, 2011, to begin gathering the wild horses.

**Preliminary Injunction Standard**

"An injunction is a matter of equitable discretion and is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (internal quotation marks omitted).

To obtain a preliminary injunction, plaintiffs must show: (1) they will probably prevail on the merits; (2) they will likely suffer irreparable injury if relief is denied; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008).

Alternatively, an injunction may issue under the "sliding scale" approach if there are serious questions going to the merits and the balance of hardships tips sharply in plaintiffs' favor, so long as plaintiffs still show a likelihood of irreparable injury and that an injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  "Serious questions are those which cannot be resolved one way or the other at the hearing on the injunction."  *Bernhardt v. Los Angeles County*, 339 F.3d 920, 926-27 (9th Cir. 2003) (internal

---

[3] Defendants assert starting the round-up in October was considered only in the event BLM could not secure funding for the gather this year; because BLM has obtained funding for this year, the round-up is their priority for this year.  (Def. Opp'n 28 n.16).

quotation marks omitted) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)).  They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'"  *Marcos*, 862 F.2d at 1362.

**Analysis**

**I. Likelihood of Success/Serious Questions**

Plaintiffs assert that the BLM's decision violates both the Wild Free-Roaming Horse and Burros Act ("Wild Horse Act"), 16 U.S.C. §§ 1331 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*.  Judicial review of plaintiffs' claims is governed by § 706 of the Administrative Procedure Act ("APA").  Under the APA, the court must set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A),(D).

Although the review of an agency decision is "searching and careful," the "arbitrary and capricious standard is narrow" and the court cannot substitute its judgment for the agency.  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005) (internal quotation marks omitted).  "This deferential standard is designed to 'ensure that the agency considered all of the relevant factors and that its decision contained no 'clear error of judgment.'"  *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001).  In deciding whether an agency violated the arbitrary and capricious standard, the court must ask whether the agency "articulated a rational connection between the facts found and the

choice made." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001).  "Agency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Pac. Coast*, 265 F.3d at 1034.  A decision that is "inconsistent with a statutory mandate or that frustrate[s] the congressional policy underlying a statute" cannot be upheld.  *Ocean Advocates*, 402 F.3d at 859.

The court reviews an agency's interpretation of a statute under *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).  *Chevron* dictates a two-step process. At step one, "if, employing the traditional tools of statutory construction," the court determines that "Congress has directly and unambiguously spoken to the precise question at issue, then the unambiguously expressed intent of Congress controls." *Nw. Envtl. Defense Center v. Brown*, 640 F.3d 1063, 1069 (9th Cir. 2011) (internal quotation marks and citation omitted) (citing *Chevron*, 467 U.S. at 843).  At step two, if the court determines that the statute is "silent or ambiguous with respect to the specific issue," it must determine "whether the agency's interpretation is based on a permissible construction of the statute.  An agency interpretation based on a permissible construction of the statute controls." *Id.* (citing *Chevron*, 467 U.S. at 844).

## A. Wild Horse Act Violations

Under the Wild Horse Act, the Secretary of the Interior is tasked with protecting and managing the wild horses on the lands it controls. *Id.* §§ 1332(a),(e), 1333(a). BLM, as designate of the Secretary, has a "great deal of discretion" in carrying out its duties, *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (citing legislative history), but it must do so "in a manner that is designed to achieve and maintain a thriving natural ecological balance." *Id.* § 1333(a).

When the Act was passed in 1971, Congress was concerned that wild horses were vanishing from the West; the Act therefore endeavored to protect wild horses "from capture, branding, harassment, or death" and mandated that they "are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. By 1978, however, conditions had changed, and Congress became concerned that wild horses were beginning to overpopulate and threaten the viability of the range. *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citing H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978), which stated: "In the case of wild horses and burros in the Western States, Congress acted in 1971 to curb abuses which posed a threat to their survival. The situation now appears to have reversed, and action is needed to prevent a successful program from exceeding its goals and causing animal habitat destruction."). Congress determined that amendments were required "to facilitate the humane adoption or disposal of excess wild free-roaming horses and burros which because they exceed the carrying capacity of the range, pose a threat to their own habitat,

fish, wildlife, recreation, water and soil conservation, domestic livestock grazing, and other rangeland values." Pub. L. 95-514, § 2(a)(6), 92 Stat. 1803, 43 U.S.C. § 1901(a)(6).  The Act was thus amended to give BLM greater authority to manage the wild horses on its lands and to require BLM to immediately remove "excess" horses. Pub. L. 95-514, § 14.

The 1978 amendments "struck a new balance between protecting wild horses and competing interests in the resources of the public range." *Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 450 (S.D.N.Y. 2010) (internal quotation marks omitted).  In fact, "[t]he main thrust of the 1978 amendments [wa]s to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d at 1316.  Thus, the amendments made "explicit what was, at most, implicit in the 1971 Act: public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Id.* at 1317.

The 1978 amendments articulated congressional intent that prompt administrative action be taken to control the excess wild horse population.  Section 1333(b)(2) of the amendments states that excess horses shall be removed immediately.  As the United States Court of Appeals for the District of Columbia held: "The statute thus clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Id.* at 1318.

In response to an inquiry by the court at the hearing on this motion, defendants represented that BLM has periodically conducted

round-ups in Nevada, fulfilling its obligations under the Act to remove excess horses in order to maintain a thriving natural ecological balance.  The round-ups have not historically been detrimental to the horses.

Plaintiffs assert that in proposing to conduct the instant round-up, BLM violated the Act in three ways: (1) by failing to make a determination that there were "excess" wild horses before deciding to remove them; (2) by failing to manage the HMA "principally" for wild horses and burros; and (3) by failing to manage the wild horses at the "minimal feasible level."

### i. Failure to Make Excess Horse Determination

"Excess" wild horses are those that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f).  The BLM is required to maintain an inventory of wild horses on public lands in order to:

> make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population).

*Id.* § 1333(b)(1).  As stated above, whenever the BLM determines that an overpopulation exists, it must "immediately remove excess animals from the range so as to achieve appropriate management levels."  *Id.* § 1333(b)(2).

Pursuant to this statutory directive, BLM establishes appropriate management levels ("AMLs") of wild horses on the ranges.  *Id.* § 1333(b)(1).  AMLs are defined by BLM as "the number

9

of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." (EA 4).  Range AMLs may be established in a number of ways, including through the preparation of "resource management plans" ("RMPs").  (*See* Pl. Mot. Ex. 4 at 46); *infra* sec. I.A.ii).  AMLs are generally not established or adjusted as part of a decision to round up excess horses.  (*Id.* at 47).

Defendants assert that the "applicable" RMP setting AMLs was last revised in 2008.  The 2008 RMP related only to the Triple B AML, which is by far the largest HMA.  (*See* Def. Opp'n Medlyn Decl. ¶ 21-22 (noting that the 2008 RMP set an AML of 250-518 wild horses for the Triple B HMA but not discussing AMLs for the other HMAs); EA 4-5).  The Maverick-Medicine AML was adjusted to its current level through a combination of decisions in 1994, 1998, and 2001. The Antelope Valley AML was last adjusted in 2001, and the Cherry Springs' AML was established in 1993.  (EA 5).

Plaintiffs argue that instead of basing its excess horse determination on the "thriving natural ecological balance" standard, BLM improperly relied on the AMLs and the fact that the number of estimated horses exceeded the AMLs.  Plaintiffs contend that the AMLs established "several years ago" do not take into account the current ecological state of the HMAs and that a thriving natural ecological balance may change based on several factors, including weather patterns and livestock grazing usage. In fact, plaintiffs assert, the EA contains misleading documentation as to the current state of the Triple B Complex, which they claim is thriving due to the recent record rainfall in

10

the area.  Although the EA concludes that wild horses are a
"contributing factor" to the failure to meet standards in the HMAs,
plaintiffs argue that these statements are conclusory and
unsupported by any evidence.  They argue that even though the EA
ostensibly relied on various standard determination documents
("SDDs") – reports of the ecological state in various discrete
areas of the Triple B Complex – those documents do not support a
finding that wild horses are threatening the natural ecological
balance.  Specifically, plaintiffs note, most of the documents do
not mention wild horses as a problem, and those that do simply
indicate they are a "contributing factor" without identifying the
relative degree of contribution.  Plaintiffs also assert that BLM
exaggerates wild horse forage utilization as compared to livestock.
Plaintiffs suggest that most of the environmental degradation
within the HMAs is due to livestock grazing.

Clearly the BLM is entitled to use the AMLs as a tool in
determining whether an overpopulation of horses exists.  The BLM
has "significant discretion" in establishing AMLs.  *In Defense of
Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d 1125, 1134
(E.D. Cal. 2010) (citing 16 U.S.C. § 1133(b)).  The AMLs here were
developed over the course of several years, and involved a
determination of exactly how many horses can be sustained within
the Triple B Complex while at the same time maintaining a thriving
natural ecological balance over the long-term.  The establishment
of the AMLs thus explicitly considered the very standard plaintiffs
assert BLM ignored: a thriving natural ecological balance.

Plaintiffs argue here that the AML is not a reliable indicator
of a thriving natural ecological balance, however, primarily

because it does not consider the recent year of heavy rainfall. That rainfall in the area may have been at record levels in the past year does not render the AMLs unreliable.  The BLM is tasked with the long-term health of the range and must manage in line with the multiple-use parameters set by Congress. "[W]ise range management techniques dictate that a given area must be restricted in use to those numbers that can be supported adequately and still allow the range to replenish vegetation." *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. at 1209, 1217-18, 1222 (denying plaintiffs' motion for preliminary injunction to stop a wild horse round-up despite the fact that the range had experienced a particularly bountiful year of rainfall and appeared to be flourishing as a result).  Defendants correctly assert that one year of above-average rainfall does not mean the rangeland health has been improved over the long-term (Def. Opp'n Fuell Decl. ¶¶ 40-41).  In fact, the record reflects that areas of Triple B are still in need of water, and in order to meet the current demand BLM has hauled several truckloads of water to the areas within the Triple B Complex since June.  (*Id*. ¶ 18).  At the hearing on this motion, defense counsel represented that one of those areas to which water was trucked in June is now dry.

Further, "even if some of the HMA's resources are not currently taxed by the existing horse and burros numbers, they soon will be given the animals' rapidly increasing populations." *In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1134.  The wild horse population in the Triple B Complex has been growing at a rate of 20-25% annually; from 2006 to the present the number of horses nearly quadrupled from 610 to 2,198.  (EA 5).

Absent action by BLM, the wild horse population will continue to grow at this rate, and within two years the population will reach an estimated 2,638 horses. (*Id.* at 12).  If this were to happen, both the horses and the rangeland would suffer. In fact, the EA warns that if nothing is done the rangeland vegetative and water resources will be taxed such that there will be no potential for their recovery. (*Id.* at 34).  A failure of the BLM to intervene, thus, would be a failure to maintain a thriving natural ecological balance within the range.

"[T]he test as to appropriate wild horse population levels is whether such levels will achieve and maintain a thriving natural ecological balance on the public lands."  *Dahl v. Clark*, 600 F. Supp. 585, 595 (D. Nev. 1984).  Although AML is defined by reference to a thriving natural ecological balance and thus explicitly incorporates this standard, BLM's Wild Horse and Burro Management Handbook states: "Justifying a removal [of horses] based on nothing more than the established AML is not acceptable."  (Pl. Mot. Ex. 4 at 47).  Even so, two courts have upheld excess horse determinations based primarily on the AML.  *See In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1133-34; *Cloud Found., Inc. v. Kempthorne*, 2008 WL 2794741, at *1 (D. Mont. 2008).

In the case at bar, the court does not need to determine that reliance on the AML is sufficient, however.  A review of the EA indicates that BLM based its excess horse determination on both the AMLs as well as other evidence indicating that wild horses were

degrading the range habitat.[4]  Specifically, the EA cites data
showing moderate to heavy utilization of forage by wild horses and
heavy to severe use of riparian areas.  (EA 24-25, 34-35).
Plaintiffs challenge this data as exaggerating horse forage
utilization compared to livestock utilization.[5]  Livestock grazing
allotments are controlled through other processes and are not
appropriately addressed in this round-up decision.[6]  Plaintiffs'
assertions with respect to the livestock have little relevance to
the excess horse determination in this case.

Because the BLM considered both AMLs and other evidence as to
current wild horse impact on the range, the BLM properly decided
there were excess horses based on the "thriving natural ecological
balance" standard.

Further, although the Act directs the BLM to consider the
current inventory of horses, information contained in RMPs, and

_____

[4] To plaintiffs' assertion that the EA relied primarily on SDDs that
do not support a conclusion that wild horses are contributing to the
degradation of the range, defendants respond that the purpose of the SDDs
is not to determine the degree of wild horse impact on the range but instead
to determine the degree of livestock impact.  Plaintiffs reply that pursuant
to BLM's own guidance the SDDs are intended to consider *both* livestock
grazing *and* wild horse grazing utilization.  While the court's own review
of the SDDs suggests that their primary purpose is to determine whether
livestock are negatively impacting range conditions, the "guidance" cited
by plaintiffs does indeed discuss the impact of wild horses.  The court need
not decide this issue, however.  Regardless of the SDDs' intended purpose,
the mere absence of discussion of wild horse impacts does not equate with
a conclusion that wild horses are not impacting the range.  That the SDDs
do not fully discuss wild horse impacts is therefore not probative.

[5] Other than this argument, plaintiffs have provided no evidence
suggesting the data is inaccurate.

[6] As will be discussed in the next section, livestock grazing
allotments are established through the process mandated by the Federal Land
Policy and Management Act of 1976 ("FLMPA"), 43 U.S.C. § 1701, *et seq.*, and
may only be changed through that process. (*See infra* sec. I.A.ii).
Accordingly, the relative contribution of livestock to wild horses to
degradation of the range is an improper consideration here.

1  other relevant factors in determining whether there is an

2  overpopulation, it also allows the BLM to act "in the absence of

3  [that] information . . . on the basis of all information currently

4  available" to it.  16 U.S.C. § 1333(b)(2).  The Act therefore

5      directs that horses 'shall' be removed 'immediately' once

6      [BLM] determines, *on the basis of whatever information [it]*
       *has at the time of [its] decision*, that an overpopulation

7      exists.  The statute thus clearly conveys Congress's view
       that BLM's findings of wild horse overpopulations should

8      not be overturned quickly on the ground that they are
       predicated on insufficient information.

9  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d at 1318 (emphasis

10 original).  The BLM is given great deference in both establishing

11 AMLs and in managing the wild horses on its lands.  *Habitat for*

12 *Horses v. Salazar*, 745 F. Supp. 2d at 453; *In Defense of Animals v.*

13 *U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1133. BLM officials

14 may act on all the information they have at the time of their

15 decision.  The declarations cited by defendants in their opposition

16 brief clearly demonstrate that at the time of BLM's decision,

17 officials were aware of a significant horse overpopulation and

18 observed firsthand its effects on the range.  (*See* Def. Opp'n

19 Thompson Decl. ¶¶ 4, 14-16, 23; *id.* Fuell Decl. ¶¶ 4, 15-17, 29).

20 The BLM has the authority to remove excess horses to the degree and

21 in the manner contemplated in this action.  Plaintiffs have failed

22 to show either a likelihood of success on, or serious questions

23 going to, the merits of this claim.

24        **ii. <u>Failure to Manage Range "Principally" for Wild Horses</u>**

25 BLM has the authority to designate "specific ranges on public

26 lands as sanctuaries" for wild horses.  *Id.* § 1333(a).  Ranges are

27 defined as being "the amount of land necessary to sustain an

28 existing herd or herds of wild free-roaming horses and burros,

15

which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands."  *Id.* § 1332(c).

Plaintiffs argue that the definition of a range as land "devoted principally but not necessarily exclusively" to wild horse and burro welfare means that BLM must manage the HMA primarily for the wild horses' benefit.  Specifically, plaintiffs argue, BLM's decision in this case effectively devotes the HMAs principally to livestock, as under it the livestock will have five times the amount of animal month units ("AMUs") than the wild horses. Plaintiffs argue that BLM's failure to devote the HMAs principally to the wild horses and burros is a violation of the Act.

Defendants respond that neither the law nor the statute supports plaintiffs' assertion.  Several courts have held that BLM is required to manage wild horses as part of the public lands and in line with multiple-use policies and that the Act cannot be read to give horses priority over any other species on the range.  *See In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1134-35; *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. at 1220-21; *see also Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d at 1317 (holding that BLM must manage herds in line with multiple-use policies).  Such a conclusion is unavoidable, defendants argue, in light of BLM's obligation under the statute to immediately remove excess horses that are threatening to degrade the habitat.

As the court has observed, the 1978 amendments to the Act expanded BLM's authority to remove excess wild horses from the

range if it determined the horse population was threatening a

thriving natural ecological balance.  "The main thrust of the 1978

amendments [wa]s to cut back on the protection the Act affords wild

horses, and to reemphasize other uses of the natural resources wild

horses consume."  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d at

1316.[7]  The amendments made clear that "public ranges are to be

managed for multiple uses, not merely for the maximum protection of

wild horses."  *Id.* at 1317.  In fact, even before the 1978

amendments, a court in this district rejected a claim that BLM

should have reduced the number of livestock on the range instead of

removing horses.  *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F.

Supp. at 1220-21.[8]  The court correctly held that the regulations

and statutes indicated that the range was to be maintained for all

the various elements of the ecosystem in line with the multiple-use

concept, and that no animal should be given a higher priority than

another.  *Id.*

The language "devoted principally but not necessarily

exclusively" must be considered in the context of the plain

statutory mandate that horses be protected "in keeping with the

multiple-use management concept for the public lands."  Under the

statute, BLM has an express obligation to remove excess horses from

---

[7] Plaintiffs argue that this case is inapposite because "it was decided before *Chevron* and never reached the question whether the BLM's current round-up plan violates substantive requirements of the Wild  Horse Act." (Pl. Mot. 19).  It is unclear what impact either of these things has on the circuit court's observation, relevant here, that the 1978 Amendments cut back on wild horse protection and that ranges are to be managed for multiple uses.  Plaintiffs' attempt to distinguish this case is thus unavailing.

[8] Plaintiffs argue that this case is also inapposite because it did not address the "devoted principally" language at issue here.  However, the "devoted principally" language was part of the statute when the court decided this case.

the range and to devote the range "principally" to the welfare of
the remaining non-excess horses, so long as the BLM's determination
of "excess" is reasonable.

Further, the Federal Land Policy and Management Act of 1976
("FLMPA"), 43 U.S.C. § 1701, *et seq.* also requires BLM to manage
public lands under principles of multiple use and sustained yield.
*Id.* § 1732(a).  The Wild Horse Act functions alongside FLMPA, and
in enacting the FLMPA Congress asserted that it was committed to
"continue the policy of protecting wild free-roaming horses and
burros from capture, branding, harassment, or death, while at the
same time facilitating the removal and disposal of excess wild
free-roaming horses and burros which pose a threat to themselves
and their habitat and to other rangeland values."  *Id.* §
1901(b)(4).

The BLM executes its duties under the FLMPA by preparing
"resource management plans" ("RMPs").  *Id.* § 1712.  Livestock
grazing levels and AMLs are set within the RMPs.  Challenges to the
allocations set by the RMP must be made through the administrative
process.  *See* 43 C.F.R. §§ 1610.1 *et seq.*  Accordingly, plaintiff's
argument that the range is devoted principally to livestock and not
to the wild horses must be asserted through the RMP process.  *See*
*In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp.
2d at 1134.  There is no evidence plaintiffs have ever challenged
the applicable RMPs.

Because the public lands must be managed with multiple uses in
mind, the court concludes that the BLM's decision to allocate the
resources as it has done in this case is not arbitrary, capricious,
or contrary to law.  Plaintiffs have thus failed to show either a

1  likelihood of success on, or serious questions going to, the merits

2  of this claim.

3           iii. **Failure to Manage at the Minimal Feasible Level**

4       Under the Act, BLM is tasked with protecting and managing the

5  wild horses on its lands.  16 U.S.C. §§ 1332(a),(e), 1333(a).  BLM

6  must manage the horses at "the minimal feasible level" and "in a

7  manner that is designed to achieve and maintain a thriving natural

8  ecological balance on the public lands."  *Id.* § 1333(a).

9       Plaintiffs argue that BLM selected the most invasive

10 alternative for the round-up, Alternative A, rejecting less

11 invasive alternatives, such as Alternative B, which would not have

12 gathered all the horses but only those that were excess.  Because

13 BLM selected Alternative A, plaintiffs contend, all of the horses

14 in the Triple B Complex will be gathered and harassed so more

15 horses will be split from family bands, all the mares will be

16 treated with contraceptives and branded with a "freeze mark," and

17 BLM will artificially adjust the sex ratio of horses on the range.

18 Plaintiffs assert this is a violation of BLM's duty to manage at

19 the minimal feasible level.

20      Defendants respond that because past round-ups have managed to

21 gather only about 80% of the existing wild horse population, it is

22 unlikely that all horses on the range will be gathered and

23 disturbed.  Further, they argue that the law fully supports all

24 techniques BLM plans to employ in this round-up and that BLM has

25 wide discretion in determining how to manage the wild horses.

26 Finally, they assert that Alternative B would not be less invasive;

27 because the mares would not be treated with contraceptives, the

28 horse population would grow at a faster rate, thus necessitating

another gather earlier than would be required under Alternative A.

As the defendants correctly point out, gathering non-excess horses into short-term holding facilities and returning them to the range, as well as treating mares with contraceptives, are actions authorized by law. *See* 16 U.S.C. § 1333(b)(1); *In Defense of Animals v. Salazar*, 675 F. Supp. 2d 89, 97 (D.D.C. 2009). The splitting of horses from their family bands would appear to be inevitable in gathers of this type, and removal of excess horses from the range is not only authorized but mandated. 16 U.S.C. § 1333(b)(2). Freeze-marking of mares treated with immunocontraceptives is not an action taken without purpose; it is intended to allow the BLM to track treated mares in order to provide insights into gather efficiency and results in only slightly increased stress levels during handling. (EA 27). Alternative B would result in more gathers, and necessarily more interference and potential harassment of the wild horses. (*Id.* at 33). Finally, plaintiffs have failed to show that a gather of this magnitude is not warranted in order to protect the rangeland habitat and maintain a thriving natural ecological balance. As discussed above, the horse population has grown at an incredibly fast pace, and their numbers are more than five times the lower range AML. Absent intervention, both the horses and the range will suffer. Accordingly, the court concludes that plaintiffs are not likely to succeed on, and have not shown serious questions going to, the merits of their claim that BLM is not managing at the minimal feasible level.

**B. NEPA Violation – Failure to Consider Alternatives to Action**

NEPA requires federal agencies to prepare an environmental

impact statement ("EIS") for any major federal action that significantly affects the quality of the human environment.  42 U.S.C. § 4332(2)(C).  Before preparing the EIS, agencies may opt to prepare an environmental assessment ("EA").  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting 40 C.F.R. § 1508.9).  If in preparing the EA the agency determines that the project would have no significant impact, it is not then required to prepare an EIS.[9]  40 C.F.R. § 1501.4(b),(e).

While the EA, like the EIS, must discuss "appropriate" and "reasonable" "alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(2)(E); *see also* 40 C.F.R. § 1508.9(b); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005), "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS," *Native Ecosystems*, 428 F.3d at 1246.  "In rejecting any alternatives, the agency must only include *brief* discussions . . . of alternatives required by 42 U.S.C. § 4332(2)(E). . . "  *Id.* (emphasis added).  An agency may reject an alternative without detailed discussion so long as it considered the alternative and provided "an appropriate explanation as to why [it] was eliminated."  *Id.*

The range of reasonable alternatives that must be considered depends on the "nature and scope of the proposed action."  *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992).

---

[9] Plaintiffs have not argued here that BLM should have prepared an EIS.

For this reason, an agency "cannot define its objectives in unreasonably narrow terms" such that "only one alternative . . . would accomplish the goals of the agency's action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (citing *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)). Even so, agencies are afforded "considerable discretion to define the purpose and need of a project." *Friends of Se. Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998). Courts review an agency's statement of purpose and need under a "reasonableness" standard. *Id.* at 1066-67.

Plaintiffs assert that BLM improperly rejected an alternative that would have reduced livestock grazing levels, thereby requiring removal of fewer wild horses. They assert two bases on which BLM improperly rejected this alternative. First, plaintiffs argue that BLM defined its objective in unreasonably narrow terms – to achieve a low AML of 472 – and therefore all alternatives that did not reduce the wild horse population to 472 were not considered in detail. Second, plaintiffs argue that the reasons BLM gave for refusing to consider this alternative in detail were arbitrary and capricious.

First, defendants respond that BLM's purpose and need statement was reasonable because it fully complied with the directives of the Wild Horse Act and the goals and objectives of the relevant RMPs. Second, defendants contend that BLM provided appropriate reasons for rejecting the livestock reduction alternative. Specifically, the EA explained that the livestock alternative was outside the scope of the project and inconsistent

1   with the relevant RMPs, and that changes to livestock grazing

2   allotments must be made through the process outlined in the FLMPA

3   regulations.  (EA 16-17; Def. Opp'n Medlyn Decl. ¶ 24).  It further

4   explained that it would be inconsistent with BLM's duty to

5   immediately remove excess horses.[10]  (EA 16).

6          BLM defined its purpose and need as follows:

7          to remove excess wild horses from the HMAs in order to
           maintain the wild horse populations within the established
8          AML ranges for the HMAs, to prevent undue or unnecessary
           degradation of the public lands and to protect rangeland
9          resources from deterioration associated with excess wild
           horses within the HMAs, and to restore a thriving natural
10         ecological balance and multiple use relationship on the
           public lands consistent with the provisions of Section 1333
11         (a) of [the Wild Horse Act].

12  While plaintiffs have taken issue with that portion of the

13  definition of purpose requiring as a necessary outcome of the

14  project reduction of the wild horses to within the AML range, the

15  AML explicitly incorporates the "thriving natural ecological

16  balance" standard.  It was thus proper and reasonable and not a

17  violation of the law for BLM to define its objectives in this way.

18  The BLM also provided an appropriate explanation as to why it

19  rejected the livestock reduction alternative: it simply could not

20  reduce livestock grazing allotments through the gather process.

21  In opposition to the BLM's stated reasons, plaintiffs argue that

22  reduced livestock grazing would be consistent with multiple use of

23  the range, that the RMPs do not require a minimum grazing allotment

24  for livestock, and that the BLM Handbook itself authorizes

25

26

27         [10] Defendants argue that water sources available during the summer is
    the limiting factor in the HMAs and that reduction of livestock would only
28  succeed in freeing up forage.  (Def. Opp'n Medlyn Decl. ¶ 26).

adjustments to AMLs in specific round-up analyses.[11]   None of these assertions contradicts the fact that livestock allotments may only be changed through amendment of the RMP.   In their reply, plaintiffs assert that RMPs may be amended through EAs and specific project proposals, citing 43 C.F.R. § 1610.5-5, and therefore defendants could have altered livestock grazing allotments through the EA for this project.   Plaintiffs' argument is without merit. The cited regulation indicates that where a proposed action would "result in a change in the scope of resource uses" the change must be instituted through amendment to the RMP.   *Id.*   Although the regulation notes that amendments may be made "in response to a specific proposal," it clearly requires that amendments be made after public involvement, preparation of an EA or EIS, interagency coordination and consistency determination and any other data or analysis that may be appropriate.   In short, any changes to resource allocations in an RMP must be developed through the official amendment process, even if they are in response to a specific proposal.   Nothing in the regulation allows amendment to the RMP through an unrelated EA without first following the established procedure.   Further, while the BLM Handbook authorizes changes to AMLs in a variety of ways, including as part of a gather decision, that does not mean livestock grazing levels may also be altered as part of a gather decision.

Plaintiffs also contest BLM's assertion that even though it has authority to close areas of the public lands to grazing in

---

[11] Although plaintiffs reference increasing AML in their briefs, they do so only in the context of reducing livestock grazing allotments.  It thus appears that plaintiffs are not separately challenging BLM's refusal to consider in detail the alternative proposing an increase in the AML.

order to provide habitat for wild horses or to protect them, the provisions of 43 C.F.R. § 4710.5 are usually applied only in cases of emergency.  Plaintiffs assert that nothing in the regulation suggests it is for emergency purposes only.  However, the existence of this regulation does not alter the fact that livestock grazing allotments must be reduced through the FLMPA regulatory process.  Therefore, BLM's application of the regulation allowing cancellation of grazing only in emergencies is not unreasonable.[12]

Accordingly, both the purpose and needs statement and the reasons for rejecting the plaintiffs' proposed alternative were reasonable, and plaintiffs have failed to establish they are likely to succeed on, or that there are serious questions going to, the merits of their NEPA claim.

## II. Likelihood of Irreparable Harm

BLM finalized its decision to round up the horses on May 17, 2011.  Plaintiffs waited until June 29, 2011 – 43 days later – to file their complaint and until July 7, 2011 – 51 days later – to file their motion for preliminary injunction.  Defendants argue that this delay counsels strongly against granting the motion because it implies a lack of urgency or impending irreparable harm. A delay of 44 days before filing a complaint and motion for TRO has been held "inexcusable," but in that case the court relied on the delay *to bolster* its decision to deny the injunction, not as the sole reason for it.  *Fund for Animals v. Frizzell*, 530 F.2d 982,

---

[12] The court defers to "an agency's interpretation of its own regulations unless that interpretation is plainly erroneous, inconsistent with the regulation, or based on an impermissible construction of the governing statute." *Nw. Envtl. Defense Center v. Brown*, 640 F.3d 1063, 1069 (9th Cir. 2011).

987 (D.C. Cir. 1975). While this court finds the plaintiffs' delay very troublesome, it is not dispositive on the issue of irreparable harm.

Plaintiffs argue that they will be harmed if the gather is allowed to proceed because the wild horse population will be reduced by 80%, horses will be forever split from their natural family groups, mares will be injected with contraceptives, the horses returned to the HMA will be unnaturally skewed to 60% male, and the male horses that are removed will be castrated.

The record reflects that not all the horses will be gathered and other horses will be released to the range after the gather. Based on historical data the population will continue to grow at substantial annual rates. In fact, the population growth between July 2006, the date of the last gather, and the present has been nearly 1,600 horses. There is no evidence that treatment of the mares with contraceptives will cause harm. Whether any particular family unit will be divided is speculative. Finally, the historical evidence before this court strongly supports the conclusion that the gather will benefit the horses rather than harm them, as fewer horses competing for limited resources will mean a healthier herd.

Plaintiffs argue that insofar as the NEPA claim is concerned, they have suffered injury because BLM failed to follow the statute's procedural requirements, citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 n.18 (9th Cir. 2011). *Babbitt* noted that "because NEPA is a purely procedural statute, the requisite harm is the failure to follow the appropriate procedures" and that accordingly injunctions were only

withheld in NEPA cases in "unusual circumstances."  241 F.3d at 737 n.18.  In light of its decision in *Winter* that a likelihood of irreparable harm must be shown before an injunction may issued, the Supreme Court explicitly noted that *Babbitt* was wrong to suggest that injunctions should be issued more or less as a matter of course in NEPA cases.  *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756-57 (2010).  Accordingly, plaintiff's reliance on *Babbitt* is misplaced.  Plaintiffs also cite *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034 (9th Cir. 2007), which noted that "[i]n the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal decision." To the extent this statement suggests that irreparable harm may be presumed from a NEPA violation, this is simply not the law.  *Winter* made clear that in order to obtain a preliminary injunction, the plaintiffs must show a likelihood of irreparable harm – NEPA violation or not.

Plaintiffs have failed to establish a likely threat of irreparable harm sufficient to qualify for injunctive relief.

**III. Balance of Hardships**

Plaintiffs argue that the balance of hardships tips sharply in their favor because they will certainly suffer irreparable harm if the injunction is not granted.  Further, they assert that BLM will not face any hardships as it has approved a round-up that begins in fiscal year 2012 (after October 1, 2011), and its assertions that horses will die of starvation or thirst are unsupported, especially in light of the current conditions in the HMAs.

Defendants respond that delaying the round-up would lead to irreparable harm to both the horses and the range.  They assert

that waiting will make the round-up much more difficult and
expensive. (Def. Opp'n Fuell Decl. ¶ 47).  More importantly, if the
excess horses are not removed, the horses will continue to deplete
the water and grazing resources on the range.  (*Id.* Thompson Decl.
¶ 19; *id.* Fuell Decl. ¶ 42-43, 48).  The EA establishes that absent
intervention, the horse population will continue to grow at a rate
of 20-25% annually, and that within two years the range will be
supporting a population of 2,638 horses.  (EA 5, 12).  The lack of
food and water will mean the horses are competing for ever more
scarce resources, and many will suffer as a result. (Def. Opp'n
Fuell Decl. ¶¶ 42-43).  If such an emergency is created, BLM would
be required to truck water to the range, costing it both time and
expense.  (*Id.* Thompson Decl. ¶¶ 17-19; *id.* Fuell Decl. 46).
Already this year BLM has had to truck water out to several parts
of the Triple B Complex.  Defendants also assert that if BLM cannot
proceed with the gather this year, it may have to be postponed for
another year because there are a limited number of contractors who
can conduct the round-up and because of "budgetary realities."
Defendants cite *In Defense of Animals v. Salazar*, 675 F. Supp. 2d
at 98 as support for its assertions.  On the basis of similar
arguments, the court there held that the balance of harms tipped in
favor of the BLM and denied the injunction in part on those
grounds.[13]

     Most of plaintiffs' assertions of hardship relate to the loss
of relationships with horses and the difficulty in observing horses

---

[13] It is worth noting, however, that the defendants in that case argued
that a winter round-up would result in fewer injuries in the area of that
gather, and that postponing until spring or summer would result in more
injuries to the horses.

1   on the range.  While the historical data suggest a small percentage
2   of wild horses will perish during the round-up, it is just as
3   likely that other horses will die from lack of food and/or water if
4   this population continues to grow as it has in the past.  The EA
5   clearly establishes that if no action is taken, the wild horse
6   population will adversely impact riparian resources within and
7   outside of the HMAs, native plant health would continue to
8   deteriorate, plants would be lost, and soil erosion would increase.
9   (EA 35).  Wild horses will continue to overconsume herbaceous
10  vegetative cover and cause trampling damage to riparian areas.
11  (*Id.* at 39).  Therefore, the court concludes that the balance of
12  harms weighs in favor of the defendants.

13  **IV. Public Interest**

14      Plaintiffs argue that the public interest favors an injunction
15  because BLM's plan is illegal and subverts congressional intent.
16  Also, preservation of the environment is in the public interest.
17  Defendants assert that the public interest favors denial of the
18  injunction because BLM is required by law to immediately remove
19  excess horses and to manage the range for multiple uses.  The court
20  concludes that the public's interest does not favor an injunction
21  where, as here, the BLM has an obligation under the Wild Free-
22  Roaming Horses and Burros Act to immediately remove excess horses.

23  **Conclusion**

24      For the reasons set forth above, the court finds and concludes
25  that plaintiffs have failed to show a likelihood of success, or
26  serious questions going to, the merits, or that they will suffer
27  irreparable injury sufficient to justify the issuance of a
28  preliminary injunction.  Further, the balance of hardships and the

public interest favor the defendants.  Therefore, plaintiffs have failed to establish under the standards of *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008), and *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) that they are entitled to a preliminary injunction. Plaintiffs' motion for preliminary injunction (#10) is **DENIED.**

     **IT IS SO ORDERED.**

     DATED: This 15th day of July, 2011.

_____
UNITED STATES DISTRICT JUDGE