**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| THE CLOUD FOUNDATION, CRAIG DOWNER, and LORNA MOFFAT, | ) ) ) | 3:11-cv-00459-HDM-VPC |
| Plaintiff, | ) ) | ORDER |
| vs. | ) ) | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, *et al.*, | ) ) ) | |
| Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, and STATE OF NEVADA, DEPARTMENT OF WILDLIFE, | ) ) ) ) | |
| Defendant-Intervenors, | ) ) | |

Before the court are the parties' motions for summary judgment (#78, #79, #82 & #83).  The court has considered the motions, the responses and replies thereto, and the revised administrative record ("AR") on file in this case, and hereby issues its order.

1

**Procedural Background**

Plaintiffs, a nonprofit organization dedicated to protecting wild horses and two concerned persons,[1] brought this action in June 2011 to enjoin a Bureau of Land Management ("BLM") round-up of wild horses set to begin in the Triple B, Antelope Valley, and Maverick-Medicine Herd Management Areas ("HMAs"), and the Cherry Springs Wild Horse Territory (collectively the "Triple B Complex" or "HMAs"). On July 7, 2011, plaintiffs filed a motion for preliminary injunction. Following a hearing on the plaintiffs' motion, the court found that plaintiffs were unlikely to succeed on the merits of their claims and issued a written order denying their request for injunctive relief. Plaintiffs appealed the court's order. While the Ninth Circuit initially issued a temporary restraining order halting the round-up, it lifted the TRO a few days later by denying plaintiffs' emergency motion for injunctive relief pending appeal. The Triple B round-up began shortly thereafter and has since concluded. After a Ninth Circuit decision in a similar action found moot an appeal of a preliminary injunction motion on the grounds the round-up sought to be halted had already been completed, *see In Defense of Animals v. U.S. Dep't of Interior*, 648 F.3d 1012 (9th Cir. 2011), plaintiffs voluntarily

---

[1] At oral argument on the plaintiffs' motion for preliminary injunction, the federal defendants properly conceded that plaintiffs had standing to bring this action. Neither the defendants nor defendant-intervenor the State of Nevada Department of Wildlife challenge plaintiffs' standing at this stage of the proceedings. Defendant-intervenor Safari Club International, while not exactly challenging plaintiffs' standing, does assert that by only making brief arguments in a footnote to their brief, plaintiffs have not carried their burden of establishing standing at this stage of the proceedings. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court finds that plaintiffs have sufficiently established their standing.

1 dismissed their appeal of this court's preliminary injunction
2 order.

3        On May 4, 2012, the federal defendants (hereinafter
4 "defendants") filed the revised administrative record (#72).
5 Plaintiffs filed their motion for summary judgment (#78) on June
6 15, 2012, defendants filed their response and motion for summary
7 judgment (#79) on July 16, 2012, and defendant-intervenors filed
8 their cross motions for summary judgment (#82, #83) on July 30,
9 2012.  After briefing of the motions had been completed, the court
10 on January 22, 2013, directed the defendants to advise the court
11 where in the administrative record or otherwise there was reference
12 to or evidence of April 2010 use pattern mapping relied on by BLM
13 in making its determination.  Defendants responded on February 1,
14 2013, by filing a motion to amend the administrative record to
15 include the use pattern map, which they claimed had been
16 inadvertently omitted, along with a declaration from Wild Horse and
17 Burro Specialist Ruth Thompson authenticating and explaining the
18 use pattern map.  The court granted the motion, allowing the
19 administrative record to be amended to include the use pattern map
20 along with the Thompson declaration.

21 **Factual Background**

22        The Triple B Complex, covering just over 1.68 million acres in
23 eastern Nevada, is home to a number of different wildlife species,
24 including sensitive migratory birds, greater sage-grouse, antelope,
25 mule deer, and wild free-roaming horses.  (AR 14-15, 47-49).  While
26 livestock grazing is also allowed within the Complex, over the last
27 decade actual grazing has been less than allotted in part due to
28 drought and in part due to competition with wild horses for forage.

3

1  (AR 50, 52).[2]

2      In order to manage the wild horses on its lands, the BLM
3  establishes appropriate management levels ("AMLs"), defined by BLM
4  as "the number of wild horses that can be sustained within a
5  designated HMA which achieves and maintains a thriving natural
6  ecological balance in keeping with the multiple-use management
7  concept for the area." (AR 15).  In 2008, BLM prepared a resource
8  management plan ("RMP") which reaffirmed an AML of 250-518 wild
9  horses for the Triple B HMA.  (AR 15-16).  AMLS of 166-276 wild
10  horses for the Maverick-Medicine HMA and 16-27 horses for the
11  Antelope Valley HMA, initially established in a 1993 RMP, were last
12  adjusted to their current levels through final multiple use
13  decisions in 2001.  (AR 16).  The AML of 40-68 wild horses for the
14  Cherry Springs Wild Horse Territory was established in a 1993
15  management plan.  *Id*.  The current AMLs for the Triple B Complex
16  thus total between 472 and 889 horses.  *Id.*  The record does not
17  reflect that the plaintiffs objected to the AMLs when they were
18  established or reaffirmed through RMPs and other decisions in 1993,
19  2001, and 2008.

20      In 2006, the BLM removed what it had determined to be excess
21  horses in the Triple B Complex, leaving 610 horses in the Complex.
22  *Id.*  An aerial direct count inventory of the Complex in November
23  2010 observed 1,832 horses.  (AR 16; AR 22549). Based on this
24  direct count and the historic growth rate of the horses, BLM
25  estimated that by summer 2011 the Triple B Complex would likely

26  _____

27      [2] Plaintiffs' motion contains factual background regarding wild horses,
their origin and predators, and an alleged BLM policy of "zeroing" out wild
28  horses that is not relevant to the court's determination of this matter and
therefore is not considered. (*See* Pl. Mot. 5-7).

contain about 2,198 wild horses.  (AR 16).  This number exceeded the low-range AML by 1,726 horses.  Accordingly, BLM determined that it had the obligation under the Wild Free-Roaming Horses and Burros Act to remove the excess horses from the range.  16 U.S.C. § 1333(b)(2).

On January 7, 2011, BLM issued a Preliminary Environmental Assessment proposing the gather.  The proposal included rounding up all 2,198 horses and re-releasing 472 into the HMAs.[3]  BLM would select horses for release with the goal of skewing the sex ratio to 60% male, 40% female.  In addition, the mares would be treated with an immunocontraceptive drug designed to prevent pregnancy for two years.  Unless adopted or sold, the horses that were not released would be taken to long-term holding facilities in the mid-western or eastern part of the country where they would remain.

The Preliminary Environmental Assessment was published for public review and comment.  After considering the comments received, BLM issued its Decision Record, Finding Of No Significant Impact and Final Environmental Assessment ("EA") on May 17, 2011.  The EA anticipated that the round-up would begin in early July or after October 1, 2011.  (AR 21).  The round-up ultimately began in late July 2011, and has since concluded, although BLM remains authorized to conduct further round-ups in the area through 2014 should such be deemed necessary to accomplish the goals set forth in the EA.  (AR 21).

**Standard**

"The court shall grant summary judgment if the movant shows

_____

[3] Round-ups have historically achieved gather efficiencies of about 80%. (AR 37).

that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1378 (9th Cir. 1998). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Lynn v. Sheet Metal Workers Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir. 1986); *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

The parties agree that this motion should be decided on the cross motions for summary judgment.

**Analysis**

Plaintiffs assert that BLM's decision violates both the Wild Free-Roaming Horse and Burros Act ("Wild Horse Act"), 16 U.S.C. §§ 1331 *et seq.*, and the National Environmental Policy Act ("NEPA"),

42 U.S.C. §§ 4321 *et seq*.  Judicial review of plaintiffs' claims is governed by § 706 of the Administrative Procedure Act ("APA"). Under the APA, the court must set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A),(D).

The court must conduct a "searching and careful inquiry" to "ensure that the agency engaged in reasoned decisionmaking." *Nw. Coalition for Alternatives to Pesticides v. U.S. Envtl. Prot. Agency*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (internal punctuation omitted).  Although the review of an agency decision is "searching and careful," the "arbitrary and capricious standard is narrow" and the court cannot substitute its judgment for the agency.  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005) (internal quotation marks omitted).  "This deferential standard is designed to 'ensure that the agency considered all of the relevant factors and that its decision contained no 'clear error of judgment.'"  *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001).  In deciding whether an agency violated the arbitrary and capricious standard, the court must ask whether the agency "articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001).  "Agency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Pac. Coast*, 265 F.3d at 1034.  A decision that is "inconsistent with a statutory mandate or that frustrate[s] the congressional policy underlying a statute" cannot be upheld. *Ocean Advocates*, 402 F.3d at 859.

While "data interpretation and analysis are functions that often lie within an agency's realm of expertise," the court must still "review those functions to ascertain whether the agency's actions were complete, reasoned, and adequately explained." *Nw. Coalition*, 544 F.3d at 1052 n.7.  Agency action will not be upheld "where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret." *Id.*

The court reviews an agency's interpretation of a statute under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  *Chevron* dictates a two-step process.  At step one, "if, employing the traditional tools of statutory construction," the court determines that "Congress has directly and unambiguously spoken to the precise question at issue, then the unambiguously expressed intent of Congress controls." *Nw. Envtl. Defense Center v. Brown*, 640 F.3d 1063, 1069 (9th Cir. 2011) (internal quotation marks and citation omitted) (citing *Chevron*, 467 U.S. at 843).  At step two, if the court determines that the statute is "silent or ambiguous with respect to the specific issue," it must determine "whether the agency's interpretation is based on a permissible construction of the statute.  An agency interpretation based on a permissible construction of the statute controls." *Id.* (citing *Chevron*, 467 U.S. at 843-44).

8

## A. Wild Horse Act Violations

Under the Wild Horse Act, the Secretary of the Interior is tasked with protecting and managing the wild horses on the lands it controls.  16 U.S.C. §§ 1332(a),(e), 1333(a).  BLM, as designate of the Secretary, has a "great deal of discretion" in carrying out its duties, *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (citing legislative history), but it must do so "in a manner that is designed to achieve and maintain a thriving natural ecological balance."  16 U.S.C. § 1333(a).

When the Act was passed in 1971, Congress was concerned that wild horses were vanishing from the West; the Act therefore endeavored to protect wild horses "from capture, branding, harassment, or death" and mandated that they "are to be considered in the area where presently found, as an integral part of the natural system of the public lands."  *Id.* § 1331.  By 1978, however, conditions had changed, and Congress became concerned that wild horses were beginning to overpopulate and threaten the viability of the range.  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citing H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978), which stated: "In the case of wild horses and burros in the Western States, Congress acted in 1971 to curb abuses which posed a threat to their survival. The situation now appears to have reversed, and action is needed to prevent a successful program from exceeding its goals and causing animal habitat destruction.").  Congress determined that amendments were required "to facilitate the humane adoption or disposal of excess wild free-roaming horses and burros which because they exceed the carrying capacity of the range, pose a threat to their own habitat,

fish, wildlife, recreation, water and soil conservation, domestic livestock grazing, and other rangeland values." Pub. L. 95-514, § 2(a)(6), 92 Stat. 1803, 43 U.S.C. § 1901(a)(6). The Act was thus amended to give BLM greater authority to manage the wild horses on its lands and to require BLM to immediately remove "excess" horses. Pub. L. 95-514, § 14.

The 1978 amendments "struck a new balance between protecting wild horses and competing interests in the resources of the public range." *Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 450 (S.D.N.Y. 2010) (internal quotation marks omitted). In fact, "[t]he main thrust of the 1978 amendments [wa]s to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Watt*, 694 F.2d at 1316. Thus, the amendments made "explicit what was, at most, implicit in the 1971 Act: public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Id.* at 1317.

The 1978 amendments articulated congressional intent that prompt administrative action be taken to control the excess wild horse population. Section 1333(b)(2) of the amendments states that excess horses shall be removed immediately. As the United States Court of Appeals for the District of Columbia held: "The statute thus clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Id.* at 1318.

In response to an inquiry by the court at the hearing on plaintiffs' preliminary injunction motion, defendants represented

that BLM has periodically conducted round-ups in Nevada, fulfilling its obligations under the Act to remove excess horses in order to maintain a thriving natural ecological balance.  The round-ups have not historically been detrimental to the horses.

Plaintiffs assert that in deciding to conduct the instant round-up, BLM violated the Act in three ways: (1) by determining there were "excess" wild horses without first finding wild horses were responsible for a loss to a thriving natural ecological balance on the range; (2) by failing to manage the HMA "principally" for wild horses and burros; and (3) by failing to manage the wild horses at the "minimal feasible level."

### i. **Failure to Make Proper Excess Horse Determination**

"Excess" wild horses are those that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  16 U.S.C. § 1332(f).  The BLM is required to maintain an inventory of wild horses on public lands in order to:

> make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population).

*Id.* § 1333(b)(1).  As stated above, whenever the BLM determines that an overpopulation exists, it must "immediately remove excess animals from the range so as to achieve appropriate management levels."  *Id.* § 1333(b)(2).

Pursuant to this statutory directive, BLM establishes appropriate management levels ("AMLs") of wild horses on the

ranges.  *Id.* § 1333(b)(1).  AMLs are defined by BLM as "the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." (AR 15).

Plaintiffs argue that wild horses may be removed only when they have actually harmed the range or upset the thriving natural ecological balance.  They assert that instead of basing its excess determination on such a finding, BLM improperly relied solely on the established AMLs and the fact the estimated number of horses exceeded them.  Plaintiffs argue that the EA's conclusion that wild horses were contributing to damage of the range was not supported by – and in some cases was contrary to – the underlying scientific data.  Specifically, they contend that data tracking utilization of forage and riparian resources in 2010 did not show overuse, and that BLM improperly attributed to wild horses what little moderate, heavy, and severe use there was.  In effectively basing its excess decision on only the AMLs, plaintiffs argue, BLM violated the Act by not first finding a loss of a thriving natural ecological balance and causally connecting the wild horses to the loss.

Defendants respond that the administrative record supports BLM's conclusion that wild horses were contributing to nonattainment of rangeland health standards.  They argue that BLM determined the range and forage resources could not support the number of wild horses on the range based not only on the AMLs but also on years' worth of direct observation, physical evidence, and data monitoring the condition of the range – not just data from 2010.  Defendants also assert that the 2010 data used by plaintiffs

is misleading because 2010 experienced unusually high
precipitation.  Defendants deny that BLM's conclusion was contrary
to the evidence, asserting instead that plaintiffs misunderstood
the method by which it reached its conclusions and base their
argument on improper "fly specking" of the administrative record.
Defendants further assert that nothing in the Act requires BLM to
wait until the range has actually deteriorated before it may act to
protect it.  Finally, defendants argue that although BLM did not
rely solely on the AMLs, authority exists that doing so would have
been proper.

     "[T]he test as to appropriate wild horse population levels is
whether such levels will achieve and maintain a thriving natural
ecological balance on the public lands." *Dahl v. Clark*, 600 F.
Supp. 585, 595 (D. Nev. 1984).  As described above, the AMLs here
were developed over the course of several years through a process
that called for and allowed public participation, *see* 43 C.F.R. §
1610.2, and involved a determination of exactly how many horses can
be sustained within the Triple B Complex while at the same time
maintaining a thriving natural ecological balance over the long
term.  The establishment of the AMLs thus explicitly considered the
very standard plaintiffs assert BLM ignored: a thriving natural
ecological balance.

     Clearly the BLM is entitled to use the AMLs as a tool in
determining whether an overpopulation of horses exists, and the BLM
has "significant discretion" in establishing AMLs. *In Defense of
Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d 1125, 1134
(E.D. Cal. 2010) (citing 16 U.S.C. § 1133(b)).  Although AML is
defined by reference to a thriving natural ecological balance and

13

thus explicitly incorporates this standard, BLM's Wild Horse and Burro Management Handbook states: "Justifying a removal [of horses] based on nothing more than the established AML is not acceptable." (Pl. Mot. Prelim. Inj. Ex. 4 at 47). Even so, two courts have upheld excess horse determinations based primarily – if not solely – on the AML. *See In Defense of Animals v. U.S. Dep't of the Interior*, 2012 WL 5828224, at *9-10 (E.D. Cal. Nov. 15, 2012); *Cloud Found., Inc. v. Kempthorne*, 2008 WL 2794741, at *1 (D. Mont. 2008).

The court finds that in this case the AMLs are a valid assessment of the number of horses that can be maintained on the range within a thriving natural ecological balance absent a showing that at the time of BLM's decision they were no longer reliable. Plaintiffs have failed to make such a showing. This is particularly so because in claiming that the range was healthy and could support more wild horses, plaintiffs rely almost entirely on the data from 2010 and eschew assessments based on data from other years as out-of-date.[4] As discussed in this court's order on plaintiffs' motion for preliminary injunction, rainfall in the area was higher than average in 2009 and 2010, providing at least temporarily a greater amount of forage. *See* http://www.wrcc.dri. edu/summary/Climsmnv.html (last visited Mar. 15, 2013); http://wdr. water.usgs.gov/wy2010/search.jsp (last visited Mar. 15, 2013). Such short-term conditions do not render the AMLs unreliable. The BLM is tasked with the long-term health of the range and must manage it in line with the multiple-use parameters set by Congress.

---

[4] As will be discussed *infra*, Part B.i, the court finds plaintiffs' other arguments unpersuasive.

"[W]ise range management techniques dictate that a given area must be restricted in use to those numbers that can be supported adequately and still allow the range to replenish its vegetation." *Frizzell*, 403 F. Supp. at 1209, 1217-18, 1222 (denying plaintiffs' motion for preliminary injunction to stop a wild horse round-up despite the fact that the range had experienced a particularly bountiful year of rainfall and appeared to be flourishing as a result). While the range may appear healthy after one year of above-average rainfall, BLM must take into account the effects of average or below average precipitation in future years. For that reason, plaintiffs' assertions based on 2010 data do not call into question BLM's finding that, on the whole, the range could not sustain the current and likely future number of horses.

Further, "even if some of the HMA's resources are not currently taxed by the existing horse and burros numbers, they soon will be given the animals' rapidly increasing populations." *In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1134. The record is persuasive that the wild horse population in the Triple B Complex had been growing at a rate of 20-25% annually; from 2006 to the spring of 2011 the number of horses nearly quadrupled from 610 to 2,198. (AR 16). Absent action by BLM, the wild horse population would have continued to grow at an unsustainable rate, and within two years the population would have reached an estimated 2,638 horses. (AR 23). If BLM had allowed this to occur, both the horses and the rangeland would have suffered. In fact, the EA warned that if nothing was done the rangeland vegetative and water resources would have been taxed such that there would have been no potential for their recovery. (AR

45). Plaintiffs have not demonstrated that this conclusion was arbitrary or capricious. Thus, a failure of the BLM to intervene would have been a failure to maintain a thriving natural ecological balance within the range as required by 16 U.S.C. § 1333(a).

Moreover, despite plaintiffs' contention that the administrative record contained insufficient information showing wild horses were degrading the range, the Act allows BLM to act "*on the basis of whatever information [it] has at the time of [its] decision.*" *Watt*, 694 F.2d at 1318 (emphasis original); *see also* 16 U.S.C. § 1333(b)(2). "The statute thus clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Watt*, 694 F.2d at 1318. The BLM is given great deference both in establishing AMLs and in managing the wild horses on its lands. *Habitat for Horses v. Salazar*, 745 F. Supp. 2d at 453; *In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1133. BLM officials may act on all the information they have at the time of their decision. Here, BLM's decision was properly based on and sufficiently supported by not only on the AMLs, but also on monitoring data demonstrating a sizeable number of horses on the range and their heavy utilization of and impact on the range's forage and riparian resources, physical evidence and the direct observations of BLM's specialists.[5]

Finally, plaintiffs' argument that wild horses may be removed

---

[5] The court is not persuaded by plaintiffs' argument that *Watt* and § 1333(b)(2) only mean that BLM can rely on information gathered for other statutory purposes. Neither the statute nor *Watt* requires such a limitation.

only when they have caused actual damage to the range is not

supported by any of the statutory provisions, legislative history,

or case law.   Plaintiffs cite 16 U.S.C. § 1333(b)(1), § 1332(f),

and House Conf. R. No. 95-1737 (1978), which discuss generally the

thriving natural ecological balance standard, the ongoing

inventories BLM is required to maintain, and the care that must be

placed in making any excess determination.   They also cite *Dahl v.*

*Clark*, 600 F. Supp. at 594, which held the benchmark for whether

there are excess horses is whether there is a thriving natural

ecological balance.   None of these citations hold that BLM may act

only after the range has suffered harm,[6] even when considered in

tandem with plaintiffs' citation to 16 U.S.C. § 1333(b)(2), which

directs BLM to remove excess animals "so as to restore a thriving

natural ecological balance to the range, and protect the range from

the deterioration associated with overpopulation."   *Id.* §

1333(b)(2).   Emphasizing the word "restore," plaintiffs seem to

suggest that the only time BLM may remove excess animals is when

the range is in need of being "restored."   This argument is a

myopic reading of the word "protect" in the statute while

disregarding the other pertinent sections of the statute directing

BLM to manage wild horses to "achieve and maintain" a thriving

natural ecological balance, § 1333(a), and defining "excess" horses

as those that must be removed to "preserve and maintain" a thriving

natural ecological balance, § 1332(f).   Contrary to plaintiffs'

assertion, the language of the statute – achieve, preserve, and

---

[6] The court is not persuaded that because BLM must maintain "ongoing inventories," any round-up decision must be based only on the most current data of the range's resources.   Nothing in the statutory language imposes such a limitation.

maintain – requires BLM to act to avoid any loss of thriving natural ecological balance before it happens.  The word "restore" contemplates that there will be times when BLM has been unable to act to prevent damage to the range and thus a thriving natural ecological balance would need to be restored.  It does not, in the opinion of the court, constrain BLM to act only where the range has already suffered.  The Act thus clearly requires BLM to act in a manner intended to maintain a thriving natural ecological balance, including the removal of horses that *threaten* to disturb that balance rather than only those horses that have already done so.

Plaintiffs have failed to show that at the time of BLM's decision the established AMLs were no longer valid in light of the overall, long-term condition of the range.  Nor have they shown that BLM's determination that the range could not support the growing population of wild horses was arbitrary, capricious, or in violation of the law.  The BLM properly relied on the AMLs along with the direct observation of its specialists, physical evidence, and data monitoring the condition of the range.  Its determination that the range suffered from an excess of wild horses was not clearly erroneous.

ii. **Failure to Manage Range "Principally" for Wild Horses**

Ranges are defined as being "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands."  16 U.S.C. § 1332(c).

Plaintiffs argue that the definition of a range as land

"devoted principally but not necessarily exclusively" to wild horse and burro welfare means that BLM must manage the HMA "for the most part" or "chiefly" for the wild horses' benefit.  Specifically, plaintiffs argue, "slightly more" of the available resources must be devoted to wild horses than to any other species on the range. Here, plaintiffs assert, BLM's decision effectively devotes the HMAs principally to livestock, as under it livestock will have five times the amount of animal unit months ("AUMs") than the wild horses.[7]  Plaintiffs argue that BLM's failure to devote the HMAs principally to the wild horses and burros is a violation of the Act.

Defendants respond that neither the law nor the statute supports plaintiffs' assertion.  Several courts have held that BLM is required to manage wild horses as part of the public lands and in line with multiple-use policies and that the Act cannot be read to give horses priority over any other species on the range.  *See In Defense of Animals v. U.S. Dep't of the Interior*, 2012 WL 5828224, at *10-11 (E.D. Cal. Nov. 15, 2012); *In Defense of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1134-35;[8] *Frizzell*, 403 F. Supp. at 1219-21; *see also Watt*, 694 F.2d at 1317

---

[7] Defendants argue that this statement is misleading because wild horses, which use the range all year, cannot be compared directly with livestock, which use the range for only a portion of the year.

[8] Plaintiffs argue *In Defense of Animals* does not support this proposition because the court misunderstood plaintiffs' argument to be that horses were entitled to sole use of the range resources.  Plaintiffs' argument is without merit, however, as it is clear from the opinion that the court properly understood the plaintiffs' position to be that horses should be given more resources than other species on the range.  *See In Defense of Animals*, 737 F. Supp. 2d at 1134 ("While Plaintiffs also claim that horse and burro populations should be given priority within the HMA, and that a greater share of available resources (and presumably different AMLs) should be allocated to them as opposed to cattle or other livestock . . . .").

(holding that BLM must manage herds in line with multiple-use policies).  Such a conclusion is necessary, defendants argue, in light of BLM's obligation under the statute to immediately remove excess horses that are threatening to degrade the habitat.

As the court has observed, the 1978 amendments to the Act expanded BLM's authority to remove excess wild horses from the range if it determined the horse population was threatening a thriving natural ecological balance.  "The main thrust of the 1978 amendments [wa]s to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume."  *Watt*, 694 F.2d at 1316.  The amendments made clear that "public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses."  *Id.* at 1317.  In fact, even before the 1978 amendments, a court in this district rejected a claim that BLM should have reduced the number of livestock on the range instead of removing horses.  *Frizzell*, 403 F. Supp. at 1219-21.  The court correctly held that the regulations and statutes indicated that the range was to be maintained for all the various elements of the ecosystem in line with the multiple-use concept, and that no animal should be given a higher priority than another.[9]  *Id.*

Further, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701, *et seq*. also requires BLM to manage

---

[9] Plaintiffs argue *Watt* and *Frizzell* do not support the proposition that BLM cannot give horses priority on the "range" because neither case dealt with "ranges" as defined by the Act.  As the definition of "range" was a part of the Wild Horse Act at the time of both *Watt* and *Frizzell* and both decisions clearly dealt with wild horses on the "range," the court finds plaintiffs' attempts to distinguish these cases to be without merit.

public lands under principles of multiple use and sustained yield. *Id.* § 1732(a). The Wild Horse Act functions alongside FLPMA, and in enacting the FLPMA Congress asserted that it was committed to "continue the policy of protecting wild free-roaming horses and burros from capture, branding, harassment, or death, while at the same time facilitating the removal and disposal of excess wild free-roaming horses and burros which pose a threat to themselves and their habitat and to other rangeland values." *Id.* § 1901(b)(4).

Despite plaintiffs' assertion that the Act is a horse protection statute, and defendants' counterassertion that it is a resource management statute, the Wild Horse Act, passed to "protect and manage [wild horses] as components of the public lands," serves both purposes. The court rejects plaintiffs' assertion that because the word "protect" is listed first that such purpose overrides the duty to "manage." The duties to protect and manage coexist and are coequal. In light of this, the language "devoted principally but not necessarily exclusively" must be considered in the context of the plain statutory mandate that horses be protected "in keeping with the multiple-use management concept for the public lands."

Plaintiffs argue that the range can be devoted primarily to wild horses in keeping with the multiple use concept by giving wild horses the largest share of the available resources and allowing other species to survive on what remains. However, under an alternative, reasonable, and permissible construction of the statute that supports BLM's actions in this case, BLM has an

21

express obligation to remove excess horses from the range and to
devote the range "principally" to the welfare of the remaining non-
excess horses, so long as the BLM's determination of "excess" is
reasonable.  Plaintiffs argue that the determination of what
constitutes "excess horses" would be different if the range's
resources were allocated differently, that BLM routinely manages
the range with horses above the AML, and that defendants have
provided no example of how managing the range principally for
horses would violate the multiple-use concept.  But devotion of the
largest share of resources to wild horses is not plainly required
by the Act.  The AMLs are a valid indicator of the number of horses
BLM believes the range may sustain within a thriving natural
ecological balance of multiple uses, and plaintiffs – who carry the
burden in this case – have not shown that the range can support
more than that.[10]

The BLM executes its duties under the FLPMA by preparing
"resource management plans" ("RMPs").  *See* 43 U.S.C. § 1712.
Overall livestock grazing levels and AMLs are set within the RMPs.
As will be discussed more fully *infra*, Part B.ii., any action
inconsistent with the balance of resources as set forth in the RMPs

---

[10] That BLM may allow horse numbers to exceed the AMLs for a period of
time before conducting round-ups does not prove that the range can support
that number of animals long term – or that BLM believes it could do so.
Rather, and in keeping with its duty to minimize interference with the wild
horses, BLM must determine when to conduct a round-up based not only the
number of horses, but also on the condition of the range and the amount and
types of past interferences. In fact, one of plaintiffs' central arguments
in this action is that BLM must consider these factors and does not have the
authority to conduct round-ups every time the number of horses crests the
established AMLs without also considering the condition of the range, a
contention with which this court agrees.

1   requires amendment to the RMP.  *See* 43 C.F.R. §§ 1610.1 *et seq*.

2   Accordingly, plaintiff's argument that the range must be devoted

3   principally to livestock and not to wild horses should be asserted

4   through the RMP process.  *See In Defense of Animals v. U.S. Dep't*

5   *of the Interior*, 2012 WL 5828224, at *10-11; *In Defense of Animals*

6   *v. U.S. Dep't of the Interior*, 737 F. Supp. 2d at 1134.  There is

7   no evidence plaintiffs have ever challenged the applicable RMPs.[11]

8       Because the public lands must be managed with multiple uses in

9   mind, the court concludes that the BLM's decision to allocate the

10  resources as it has done in this case was not arbitrary,

11  capricious, or contrary to law.

12          iii. <u>Failure to Manage at the Minimal Feasible Level</u>

13      Under the Act, the BLM is tasked with protecting and managing

14  the wild horses on its lands.  16 U.S.C. §§ 1332(a),(e), 1333(a).

15  The BLM must manage wild horses at "the minimal feasible level" and

16  "in a manner that is designed to achieve and maintain a thriving

17  natural ecological balance on the public lands."  *Id.* § 1333(a).

18      Plaintiffs argue that by selecting Alternative A over what

19  they argue was a less invasive but more effective Alternative B,

20  BLM violated its duty to manage at the minimal feasible level.

21

22      [11] Plaintiffs argue that there is no way to assert this claim by
    challenging the RMP.  However, simply because plaintiffs are not currently
23  able to challenge the relevant RMPs in this case does not mean they could
    not have done so when the RMPs were drafted or revised.  Further, plaintiffs
24  argue that amendment to the RMP is not required to adjust livestock grazing
    levels.  For the reasons discussed *infra* Part B.ii, plaintiffs cite no
25  authority for the proposition that large-scale adjustments which alter the
    balance in favor of wild horses may be accomplished outside the RMP process.
26   Finally, and most importantly, plaintiffs cite no law compelling BLM to
    make adjustments to livestock grazing preferences in order to accommodate
27  more wild horses.

28                                      23

Under Alternative B, BLM would have gathered and permanently removed only the excess horses and would not have done anything else.  Under Alternative A, BLM planned to gather as many horses on the range as feasibly possible, permanently remove the excess horses, and apply a series of measures intended to slow wild horse population growth.  According to the EA, over the course of eleven years more horses would be gathered under Alternative A than under Alternative B (4,448 under Alternative A compared to 3,026 under Alternative B), but fewer horses would be permanently removed (2,636 under Alternative A compared to 2,916 under Alternative B).  (AR 81-82).  Plaintiffs assert that the gather of all the horses on the range, and not just those that were excess, as well as the application of fertility controls, was unnecessary and a violation of the duty to manage at the minimum feasible level, particularly because at the end of eleven years, the population of wild horses on the range was projected to be higher under Alternative A than under Alternative B (1,138 under Alternative A compared to 1,080 under Alternative B).  (AR 80, 82).

Defendants respond that the law fully supports all techniques BLM planned to employ in the round-up, that such techniques would not have been authorized if they did not qualify as minimal management, and that BLM has wide discretion in determining how to manage the wild horses.  Further, they respond that contrary to plaintiffs' assertions, Alternative B would have been more, not less, invasive.  Because the mares would not have been treated with contraceptives, the horse population would have grown at a faster rate.  This would have required another gather earlier than will be

24

required under Alternative A, and would have resulted in a greater number of horses permanently removed from the range. In short, in BLM's opinion, Alternative B was the more invasive of the options.

Plaintiffs respond that merely because the strategies are lawful does not mean employing all of them together is lawful, and that nothing in the record supports the assertion that there would be more gathers under Alternative B than under Alternative A.

Plaintiffs' claim is essentially a disagreement with defendants over what constitutes more invasive management. Plaintiffs argue that BLM's chosen method, which would impact all or nearly all the wild horses in some way, was the most invasive of the options. BLM, on the other hand, found that Alternative B was more invasive because it would have resulted in more gathers[12] and the permanent removal of a greater number of horses.

The court does not find the BLM's position in this respect to be arbitrary, capricious or an unreasonable interpretation of the statutory mandate. As discussed above, the horse population had grown at an extremely fast rate, and by the summer of 2011 was projected to be more than five times the lower range AML. Absent

---

[12] Despite plaintiffs' assertion that there is no support for this proposition in the record, logic dictates that the population would grow faster and more horses would need to be removed from the range in the absence of fertility controls, and thus gathers would need to be conducted more frequently. *See In Defense of Animals*, 2012 WL 5828224, at *12 ("[G]iven the burgeoning population, efforts to slow reproduction (and the need to remove excess horses in the future) through immunocontraceptives administered to released mares, and through a skewed sex ratio of mares to stallions . . . . [are] specifically designed to slow the growth rate and consequently decrease the need to remove horses and burros from the range in the future. In that sense, the BLM's actions are clearly designed to minimize intervention in the long run.).

1  intervention, both the horses and the range would have suffered.[13]

2  BLM's conclusion that this was the minimum feasible level of

3  management was not contrary to the law.

4      **B. NEPA Claims**

5      NEPA requires federal agencies to prepare an environmental

6  impact statement ("EIS") for any major federal action that

7  significantly affects the quality of the human environment.  42

8  U.S.C. § 4332(2)(C).  Before preparing the EIS, agencies may opt to

9  prepare an environmental assessment ("EA").  *Blue Mountains*

10 *Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.

11 1998) (quoting 40 C.F.R. § 1508.9).  If in preparing the EA the

12 agency determines that the project would have no significant

13 impact, it is not then required to prepare an EIS.[14]  40 C.F.R. §

14 1501.4(b),(e).  "An EA is a concise public document that briefly

15 provides sufficient evidence and analysis for determining whether

16 to prepare an EIS or a finding of no significant impact."  *Earth*

17 *Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir.

18 _____

19     [13] Plaintiffs argue that it was clear legislative intent to avoid
   intensive management of wild horses, citing S. Rep. 92-242, 92nd Cong., 1st
20 Sess. 1971 at 2152 ("An intensive management program of breeding, branding
   and physical care would destroy the very concept that this legislation seeks
21 to preserve . . . leaving the animals alone to fend for themselves and
   placing primary emphasis on protecting the animals from continued slaughter
22 and harassment by man.").  However, this legislative intent, expressed in
   1971, must be considered in the context of the subsequent amendments in
23 1978, which recognized the growth of the wild horse population needed to be
   curbed.  Further, BLM's actions in this case do not violate the "very
24 concept" 1971 Act sought to preserve – "leaving the animals alone to fend
   for themselves."  It does, in fact, foster that concept by reducing the
25 number of horses that will one day lose their freedom entirely by virtue of
   being excess.
26

27     [14] Plaintiffs have not argued here that BLM should have prepared an
   EIS.

28                                    26

2012) (internal punctuation omitted).

As a procedural – and not a substantive – statute, NEPA "does not mandate particular results," *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012); *see also Earth Island Inst.*, 697 F.3d at 1019. Instead, NEPA is designed "to ensure that federal agencies take a 'hard look' at the environmental consequences of their proposed actions before deciding to proceed." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012). It is further intended to assure that the evidence on which an agency bases its decision is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

> [A]n agency's decision can be set aside only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Earth Island Inst.*, 697 F.3d at 1013 (quoting *Lands Council v. McNair (Lands Council II)*, 537 F.3d 981, 987 (9th Cir. 2008)).

### i. Failure to Ensure Scientific Integrity of Analysis

The court must ensure the BLM's procedure resulted in a reasoned analysis of the evidence and that BLM made the evidence available to all concerned. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985). Further, BLM is required to disclose the data on which any expert opinion is based. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998), *overruled on other grounds by The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008). At the same time, in "reviewing

27

1    scientific judgments and technical analyses within the agency's

2    expertise," the court is generally "'at its most deferential'"  *N.*

3    *Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067,

4    1075 (9th Cir. 2011).  To that end, the court may not "fly speck an

5    EA and hold it insufficient on the basis of inconsequential,

6    technical deficiencies."  *Earth Island Inst.*, 697 F.3d at 1020

7    (internal punctuation omitted).  While an agency must "support its

8    conclusions with studies that the agency deems reliable,"

9    *Tri-Valley*, 671 F.3d at 1124, it will be found to "have acted

10   arbitrarily and capriciously only when the record plainly

11   demonstrates that the agency made a clear error in judgment in

12   concluding that a project meets the requirements of NEPA."  *Native*

13   *Ecosystems*, 697 F.3d at 1052 (internal punctuation and citation

14   omitted).

15       Agencies must ensure the scientific integrity of the

16   discussions and analyses in environmental impact statements,

17   including identifying any methodologies used and making "explicit

18   reference by footnote to the scientific and other sources relied

19   upon for conclusions in the statement."  40 C.F.R. § 1502.24.  It

20   is not entirely clear whether, in this circuit, § 1502.24 applies

21   to an EA.[15]  However, even assuming the requirement applies,

22   plaintiffs' argument is still not persuasive.

23

24       [15] *See Earth Island Inst.*, 697 F.3d at 1019 ("By its terms, this
     regulation only applies to preparation of an EIS, but the Forest Service
25   does not dispute that this scientific integrity requirement applied to their
     EA.  Therefore, we assume without deciding that this requirement does in
26   fact apply to . . . [an] EA."); *Idaho Sporting*, 137 F.3d at 1150.  To the
     extent § 1502.24 does not apply to an EA, plaintiffs' claim that BLM failed
27   to ensure the scientific integrity of the EA fails.

28                                    28

1    Plaintiffs' first and central attack goes to the EA's claim
2  that approximately 28% of the Triple B HMA had moderate-to-severe
3  utilization "directly attributable to" wild horses in April 2010.
4  Plaintiffs argue that the forage utilization sheets in the record,
5  which track the level of forage used at discrete sites, reflect
6  that only 12% of areas in the Triple B HMA experienced moderate to
7  severe utilization in April 2010.  Plaintiffs further argue that
8  the utilization sheets at most of the sites with moderate to severe
9  utilization either do not mention wild horses as users, or mention
10 wild horses alongside other users, which plaintiffs assert means
11 that even at those sites BLM could not prove utilization was
12 "driectly" attributable to wild horses.

13    Defendants assert that the percentages of forage utilization
14 in the Triple B HMA were not based on the utilization sheets alone,
15 nor did the EA claim that they were.  Rather the percentages were
16 based on use pattern mapping, a distinct methodology.  Defendants
17 argue that plaintiffs' calculation of the percentages of
18 utilization was improper because it averaged together utilization
19 across locations, plant species and for different time periods.
20 Finally, defendants argue that the utilization sheets simply
21 identify all known users of an area and do not purport to identify
22 how much utilization is attributable to each user.

23    Plaintiffs arrived at their asserted percentages by assigning
24 each of the Triple B HMA utilization sheets from April 2010 to one
25 of the utilization categories from zero to severe.  The assignment
26 was based on the highest average utilization of any species in that
27 site.  Plaintiffs assert that because only six of the fifty sites

28                              29

surveyed had utilization of at least one species that was moderate, heavy or severe, only 12% of sites in the Triple B HMA were subject to a utilization rate that was of concern.

However, the EA did not arrive at the 28% figure on the utilization sheets, it did so based on the April 2010 use pattern map.  While use pattern mapping is clearly related to the raw data collected by the utilization sheets, it is not the same thing.  *See* Utilization Studies and Residual Measurements at 23-24 & 81-85, *available at* www.blm.gov/nstc/library/pdf/utilstudies.pdf (last visited February 15, 2013; Nevada Rangeland Monitoring Handbook (2d Ed.) app'x H, *available* at www.unce.unr.edu/publications/ files/ag/2006/eb0603.pdf (last visited February 15, 2013); (Doc. #93-1 (Thompson Decl. ¶¶ 10-11)).  The use pattern map is based on the data contained in the utilization sheets along with the observational and professional opinion and field notes of BLM's experts.  (Thompson Decl. ¶ 10).  Plaintiffs have not shown that use pattern mapping is an improper way to gauge forage utilization on the range.

Moreover, and more importantly, plaintiffs have provided no evidence – scientific or otherwise – that their method of cataloguing the utilization sheets' information is a scientifically reliable manner of measuring utilization on the range.  In particular, while plaintiffs rely on a flat tally of the utilization sheets in the record, the Triple B Complex is not uniform in terms of terrain, forage, water, and horse population. (*See* Thompson Decl. ¶¶ 12, 13, 15).  Plaintiffs' chosen method fails to take into account these factors as it ascribes equal

30

weight to each site in the HMA.  Further, the use pattern map shows BLM where forage is heaviest in areas of concern, something that a flat tallying of percentages based on the utilization sheets in the record likely could not.  (*See id.* ¶¶ 13, 15).  Therefore, plaintiffs' calculations of the April 2010 utilization on the range does not prove that BLM misrepresented the scientific evidence of utilization upon which it based its decision.

The EA's cited percentages of forage utilization were based on the April 2010 use pattern map, which the defendants have produced and is now part of the administrative record.  There is nothing in the use pattern map contradicting the EA's stated percentages, and BLM is entitled to rely on its experts' reading of the technical and scientific information contained in that map.  The court cannot conclude on the basis of this administrative record that the EA misrepresented the scientific data regarding utilization of the range.

Further, plaintiffs' reading of the utilization sheets to prove wild horse utilization only where wild horses were the sole or first listed users is not supportable.  Many of the sheets noting multiple users specifically noted evidence showing wild horses utilization, making the utilization at those sites most likely attributable to wild horses.  Even without such notations, it was not arbitrary or capricious for BLM to conclude that, given the significant horse population, it was likely that horses were contributing to forage utilization in those areas where they were known users.

Second, plaintiffs argue that the EA improperly relied on high

31

utilization recorded at two key areas in the Maverick-Medicine HMA instead of averaging together the utilization across the allotments, as required by BLM policy.  Plaintiffs argue that while BLM found 72% utilization at a key area in the Maverick-Ruby #9 Allotment and 33% utilization at a key area in the Valley Mountain Allotment, the average utilization at all sites in those allotments was 43% and 14%, respectively, and BLM's own policies consider average utilization below 60% to be healthy.

Defendants dispute that BLM considers up to 60% average utilization healthy, arguing that plaintiffs extracted that figure from a document that applies to only the West Cherry Creek Allotment.[16]  The percentage of allowable utilization differs by allotments, users, and time period, defendants argue, so the 60% figure is not applicable to the entirety of the Triple B Complex. In fact, defendants argue, the maximum allowable prelivestock utilization in the Maverick-Ruby #9 and Valley Mountain Allotments is 10%, (AR 28077), and several utilization surveys clearly show wild horses were exceeding that number in the Valley Mountain Allotment.  (AR 22792, 22803, 22806, 22810).  Finally, defendants argue, BLM did not rely solely on usage at one site, and the EA clearly shows it considered a variety of information.

Plaintiffs' argument that up to 60% utilization is considered healthy by BLM standards is plainly wrong.  The 60% figure cited by plaintiffs, as defendants point out, relates to only one area of the Triple B Complex.  Moreover, although plaintiffs assert that

---

[16] Plaintiffs cited AR 28693 for the 60% figure.

utilization in Valley Mountain and Maverick-Ruby #9 was acceptable under BLM standards, there is evidence in the administrative record that prelivestock utilization by wild horses in Valley Mountain was exceeding the 10% maximum applicable to that area.  Moreover, even assuming plaintiffs' figure of 43% average utilization in Maverick-Ruby #9 is correct, 43% utilization is still a significant amount of utilization.  Finally, although the EA highlighted some of the more problematic areas of overuse, it did not base its excess determination on those isolated areas alone.  As is clear from the EA and administrative record, the BLM considered a variety of information about the state of the range, including utilization data sheets, riparian functional assessments ("RFAs"), Standards Determination Documents ("SDDs"), population inventories, and photos.  These documents do not show overuse at only a few isolated areas in the Triple B Complex.  Taken together with BLM officials' and experts' awareness of a significant horse overpopulation within the complex, the administrative record shows that an overpopulation of wild horses was very likely responsible for much of the actual or threatened degradation of the range.

Third, plaintiffs argue that the most current data in the record showed rangeland health standards were being met, and that the SDDs cited by BLM indicating otherwise were based on data that was out of date.  Plaintiffs also argue that the EA concluded that wild horse use of riparian areas was averaging heavy to severe use without citation to any evidence in support.  Defendants respond that the SDDs demonstrate that several riparian areas were at risk and that data from a single year of abundant rain (2010) does not

1  erase the prior damage done to the range from years of lesser

2  precipitation and wild horse overuse.

3      As discussed above, BLM is tasked with long-term management of

4  the range, which requires consideration of years' worth of data and

5  not just data collected after a period of abundant rainfall.  As to

6  plaintiffs' claim that BLM failed to provide any authority for its

7  claim that wild horse use of riparian areas was averaging heavy to

8  severe use, the court concludes that the EA's statement in this

9  regard was clearly based, at least in part, on personal observation

10  by BLM's specialists, and that the administrative record as a whole

11  also supports this claim. (*See* AR 33 (noting BLM officials'

12  experience and observations that water is limited in summer months

13  requiring BLM to haul water to various sites in the Complex); AR

14  22604; AR 22606-07).

15      Fourth, plaintiffs argue that the EA misrepresented a photo

16  taken on May 5, 2009, by claiming that it showed severe wild horse

17  use and that there had been no livestock grazing at that site for

18  the preceding three years.  Plaintiffs assert that in fact that

19  site had been overgrazed by livestock for the nine years before the

20  photo was taken.  Defendants respond that officials knew that at

21  that particular site within the allotment, there had been no

22  livestock grazing for the preceding three years and that all

23  livestock grazing had taken place at other sites in the allotment.

24  The court is not persuaded that BLM misrepresented the photograph

25  in question.

26      Finally, plaintiffs dispute the EA's conclusion that

27  Alternative B would exceed high-end AML before Alternative A

28                          34

because the EA's population analysis actually found that after eleven years the population of horses on the range would be greater under Alternative A than under Alternative B.  However, it stands to reason that the population would grow faster in the absence of fertility controls (Alternative B) than with fertility controls (Alternative A) and thus exceed high-end AML sooner.  Further, the population modeling estimate cited by plaintiffs projects the number of horses on the range after eleven years and does not necessarily bear on when the horse population would exceed the high-end AML.  BLM's conclusion in this respect is therefore not contradicted by the record.

The administrative record amply supports BLM's conclusion that the wild horse population was excessive and consuming more forage than could reasonably be supported by the range long term.  The EA noted that water is limited during summer months and BLM must haul water to sustain the wild horse population, a statement that clearly comes from the personal knowledge and experience of BLM officials.  (AR 33-35).  In addition, BLM officials assessed wild horse use of riparian areas to be heavy to severe.  (AR 45-46).  The aerial count and population inventory map showed a sharply increased horse population.  (AR 22549).  And the SDDs and utilization sheets found significant wild horse forage utilization as well as horse-caused degradation of the range.  (*See* AR 22589, 22595, 22604, 22606-07 (August 2010 SDD noting several sites and springs that were not meeting standards due in part or primarily to wild horse use and/or trampling); AR 22803, 22806, 22810 (prelivestock utilization sheets from October and November 2010

showing more than 10% prelivestock utilization in areas where horses were known users); AR 22818 (noting severe utilization in April 2010 attributable to horses, cattle, and wildlife); AR 22848 (noting moderate (nearly heavy) utilization in April 2010 attributable to horses); AR 22850 (showing moderate utilization in area used by livestock, wildlife, and horses, but noting specifically the presence of "horse tracks/manure"); AR 22902 (showing moderate utilization in May 2010 attributed to "horse use"); AR 22910 (showing moderate utilization in May 2010 and noting "horse piles and heavy trails"); AR 22950 (noting moderate utilization in area where horses were known users); AR 22956 (same); AR 22958 (same); AR 22968 (noting moderate utilization in area where wild horses were possibly users); AR 22970 (same); AR 22972 (showing light utilization that "appeared to be all wild horse use, no sign of cattle use"); AR 23295 (2009 SDD noting heavy utilization by wild horses at Key Area CC-08 in Woodcamp Pasture in 2008)).

A calculation within the agency's area of expertise that has support in – and is not contradicted by – the record is entitled to deference. *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1073-74 (9th Cir. 2012). Plaintiffs have not identified any conclusion in the EA that runs directly counter to the evidence in the administrative record, nor have they established that BLM's interpretation of the evidence was clearly wrong. As discussed above, Congress intended for BLM to rely on whatever information it had, including the observations and opinions of its experts. BLM's

36

decision in this case was based both on the hard data in the record and the observations of its specialists.  Plaintiffs have failed to establish that BLM failed to take the requisite hard look at the evidence or that there was a clear error of judgment, or that BLM failed to ensure the scientific integrity of the EA.

### ii. Failure to Consider Alternatives to Action

While an EA, like an EIS, must discuss "appropriate" and "reasonable" "alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(2)(E); *see also* 40 C.F.R. § 1508.9(b); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005), "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS," *Native Ecosystems*, 428 F.3d at 1246.  "In rejecting any alternatives, the agency must only include *brief* discussions . . . of alternatives required by 42 U.S.C. § 4332(2)(E). . . " *Id.* (emphasis added).  An agency may reject an alternative without detailed discussion so long as it considered the alternative and provided "an appropriate explanation . . . as to why [it] was eliminated." *Id.*

The range of reasonable alternatives that must be considered depends on the "nature and scope of the proposed action." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992). For this reason, an agency "cannot define its objectives in unreasonably narrow terms" such that "only one alternative . . . would accomplish the goals of the agency's action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070

37

1   (9th Cir. 2010) (citing *City of Carmel-By-The-Sea v. U.S. Dep't of*

2   *Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)).   Even so, agencies

3   are afforded "considerable discretion to define the purpose and

4   need of a project." *Friends of Se. Future v. Morrison*, 153 F.3d

5   1059, 1066 (9th Cir. 1998).   Courts review an agency's statement of

6   purpose and need under a "reasonableness" standard. *Id.* at 1066-

7   67.

8       Plaintiffs challenge BLM's purpose and need statement for

9   including the objective of reducing the wild horse population to

10  within the established AML range.   Plaintiffs assert that doing so

11  failed to take into account whether a thriving natural ecological

12  balance was actually being threatened.   They further argue this

13  aspect of the statement defined BLM's objectives in unreasonably

14  narrow terms, thereby precluding detailed consideration of all

15  alternatives that did not reduce the wild horse population to low

16  AML of 472 – including an alternative that would have reduced

17  livestock grazing allotments in order to accommodate more wild

18  horses.   Finally, plaintiffs argue that the reasons BLM gave for

19  refusing to consider the reduction-in-livestock alternative in

20  detail were arbitrary and capricious.

21      Defendants respond that BLM's purpose and need statement was

22  reasonable because it fully complied with the directives of the

23  Wild Horse Act and the goals and objectives of the relevant RMPs,

24  and that BLM provided appropriate reasons for rejecting the

25  livestock-reduction alternative.

26      BLM defined its purpose and need as follows:

27          to remove excess wild horses from the HMAs in order to

28                                   38

> maintain the wild horse populations within the
> established AML ranges for the HMAs, to prevent undue or
> unnecessary degradation of the public lands and to
> protect rangeland resources from deterioration associated
> with excess wild horses within the HMAs, and to restore a
> thriving natural ecological balance and multiple use
> relationship on the public lands consistent with the
> provisions of Section 1333 (a) of [the Wild Horse Act].

While plaintiffs have taken issue with that portion requiring as a necessary outcome of the project reduction of the wild horses to within the AML range, the AML explicitly incorporates the "thriving natural ecological balance" standard.  And, as previously discussed, plaintiffs have failed to show that the established AMLs were no longer reliable or that a thriving natural ecological balance was not being threatened.  Further, this objective was included as a means to accomplish the broader goal of achieving a thriving natural ecological balance.  A narrower objective included within and as a means to accomplish broader land-use objectives can be reasonable, even if the objective on its own would be too narrow.  *See, e.g.*, *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812-13 (9th Cir. 1999).  It was thus proper and reasonable and not a violation of the law for BLM to define its objectives in this way.

As an initial matter, the court notes that the EA considered four alternatives in detail.  As observed by the Ninth Circuit, the court is "aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and a preferred action alternative."  *Earth Island Inst.*, 697 F.3d at 1022 (noting that in at least one case the Ninth Circuit upheld an EA considering only the preferred alternative and the no-action

alternative without any discussion of "the other alternatives the agency had rejected and whether the agency had provided sufficient reasons for rejecting the alternatives").  Here, BLM satisfied its obligation under NEPA to consider alternatives to its action.

Furthermore, BLM provided an appropriate explanation as to why it rejected the livestock reduction alternative: it simply could not reduce livestock grazing allotments through the gather process. The EA explained that the livestock alternative was outside the scope of the project and inconsistent with the relevant RMPs, and that changes to livestock grazing allotments must be made through the process outlined in the FLPMA regulations.  (AR 27-28).

Plaintiff dispute the validity of BLM's reasons, arguing that livestock grazing may be reduced or terminated completely outside of the RMP process.  Further, plaintiffs argue, BLM's assertion that it could not consider the alternative because it had a duty to immediately remove excess horses ignores the fact that BLM frequently manages wild horses in excess of the AMLs without conducting round-ups and that the definition of "excess" would be different if BLM reduced the amount of allowable livestock grazing. BLM's refusal to consider an alternative that would increase AML and decrease livestock grazing, they argue, was therefore arbitrary and capricious.

The government responds that while it may make adjustments in livestock grazing allotments when it is shown the rangeland is not meeting standards, there is no authority for the proposition that livestock allotments may, on a wholesale basis, be reallocated to wild horses absent amendment of the RMP.  Further, the government

40

argues, regardless of BLM's ability to adjust livestock grazing and AML levels outside of the RMP process, plaintiffs have not shown that doing either would accomplish the goal of protecting the range from an overpopulation of wild horses.

The regulations cited by plaintiffs indeed allow for some adjustment to livestock grazing levels outside of the RMP process. 43 C.F.R. §§ 4110.3, 4130.3-3, 4710.5.  At the same time, however, any action that is inconsistent with the RMP must be accomplished by amending the RMP.  43 C.F.R. §§ 1610.5-3, 1610.5-5.  In the RMPs, the BLM struck what it considered to be the balance between not only wild horses and cattle but all the other wildlife species on the range.  In BLM's view, a large-scale rebalancing of the range's resources would be in conflict with the balance struck by the RMP, and therefore should only be accomplished by amending the RMP.  This interpretation is not unreasonable given the purpose of the RMP to provide the framework for the BLM's management of the public lands for multiple uses.  *See* 43 C.F.R. § 1601.0-2 ("The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management" and the RMP is "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses.").  Moreover, none of the regulations cited by plaintiff allow for the large-scale rebalancing plaintiffs seek. Instead, they allow for minor adjustments to permits and leases, § 4110.3 and § 4130.3-3, or for emergency closure of the range to

1  livestock in order to provide habitat for wild horses, § 4710.5.

2  BLM has determined that while this last provision allows BLM to

3  discontinue livestock grazing when necessary to protect those

4  horses determined by BLM to be nonexcess it does not allow BLM to

5  make long-term readjustments to the balance of resources –

6  including to the number of wild horses that may be sustained on the

7  range.  This is a reasonable interpretation of the regulation,

8  particularly given the existence of regulations requiring amendment

9  to the RMP for actions inconsistent therewith, and it is entitled

10 to deference by this court.[17]

11 **Conclusion**

12      For the foregoing reasons, the plaintiffs' motion for summary

13 judgment (#78) is **DENIED,** and the cross motions for summary

14 judgment filed by defendants (#79) and defendants-intervenor (#82,

15 #83) are **GRANTED.**

16      **IT IS SO ORDERED.**

17      DATED: This 26th day of March, 2013.

18                          _____
                            UNITED STATES DISTRICT JUDGE

19

20

21

22

23      [17] Plaintiffs cite to BLM's Wild Horses and Burros Handbook to show
   that AMLs may be adjusted outside the RMP process.  However, even the
24 Handbook states that AMLs established in a land-use plan must be adjusted
   through the process outlined in the land-use plan or by amending or revising
25 the land-use plan.  (BLM Wild Horse and Burro Handbook, p. 10 §§ 2.5.1,
   2.5.1.1).  The AMLs here were mostly established in land-use plans – the
26 RMPs – and thus even under BLM's guidance cited by plaintiffs, a plan
   amendment or action taken through a process outlined in the RMP is required
27 to adjust those AMLs.

28                                    42